2018-22-67, Mr. Perry, when you are ready. Good morning, Your Honor, and may it please the Court. This Court should reverse and remand the decision of the trial court because the PDBR, the Physical Disability Board of Review, used negative evidence, the lack of medication records and other treatment records. Let me clarify something, okay? In describing the contested motion before the Court of Federal Claims, Mr. Hapmaker refers to it interchangeably as a motion to complete the administrative record and a motion to supplement the administrative record. Is it fair to say both those were the same thing and correctly construed by the Court as being the same thing? As for practical effect, I think there is no difference in this instance, Your Honor. Okay. So that's the sole issue, really, whether it revolves around whether the administrative record should have been supplemented? Yes, Your Honor. Yeah, okay. Well, the importance of that is that the PDBR, in rendering its decision, its second addendum to its original, so its third try at addressing Mr. Hapmaker — Let me ask you another housekeeping question, okay? The government says that one of the 15 pages Mr. Hapmaker seeks to supplement was, in fact, already admitted as evidence. Is that correct? Yes, Your Honor. Okay. Thank you. What probative value would those records have in any event? I mean, because, as I understood it, the Court of Claims said that they wouldn't. And we, of course, disagree, and that's really the point. The Court said it had no probative value. We believe it does because the PDBR, in rendering its decision, made two points. It said the severity of Mr. Hapmaker's condition would not have been that great with a lack of prescriptions and other treatment records. So it discounted the severity of the conditions in the first place, which impact the underlying question from the Board as to the fitting nature or unfitting nature of his disabilities, both the vertigo and the OCD. Now, the vertigo is already conceded and is part of the record, is unfitting. But the combined nature of the OCD with that, especially as it relates to the impact of his ability to drive, which is an issue that the PDBR... So you're saying that these records just show that he was on a lot of prescription medication and maybe shouldn't have been able to drive? That in addressing the PDBR's contention that, two things, the severity of his condition was obviously not that great because there was a lack of these prescriptions in the record. But also, in two places in the PDBR's third decision, or addendum to its first decision, but its third time around, it questioned Mr. Hatmaker's credibility. And there's also discussion in the record of, in the PDBR's decision, of the importance of the records as supporting or undercutting his credibility in its decision being based on its view of his credibility. So in attributing the lack of these records as undermining his... Well, what about the prescriptions relates to his vertigo, or the severity of his vertigo? There's a scopolamine patches, there's several instances there, and there's also an ER record. It's not all prescriptions. There's also the emergency room records where he went to see treatment after a particularly bad episode. And then there is the OCD medications, the mental health medications as well, which was more specifically referenced by the PDBR as lacking. Okay, can you explain why you think that 416B applies to the Air Force? Putting aside any questions. It's a VA reg, right? Yes, Your Honor. So how does it apply to the PDBR? Okay. From 2008, the National Defense Authorization Act, Congress has stated that the military departments and the secretaries must apply the VA regulations to decisions as to unfitness, fitness and ratings under Chapter 61 of 10 U.S. Code. So all of the, what's so-called the VASRD or the VA Schedule for Rating Disabilities is while directed at the VA facially, is also applicable to the military departments. And in fact, the Air Force through the PDBR did address several VA regulations. There's a couple of references, especially interpretation of reports. They cited themselves in their decision 4.2. So that demonstrates that the VA, further that not only does it apply, but also that the Air Force treats it as it applies to them, the VA Schedule. Can you show me where you raised that issue in the record below? I know you raised 4.16a, but where is your reference to 4.16b? Okay, so in the complaint, paragraphs 15 through 16, there is not, to clarify, Your Honor, there is not a specific, we did not say 4.16b applies prior to the final decision of the PDBR. We raised it generally. We said 14, we asked for, in the PDBR application originally, we asked for consideration for unemployability generally, and we cited 4.16. Now there's two subsections there, but by logical application, if we're not limiting it in any way ourselves, it should apply that it should be read to mean that we mean the entire section to apply. Did you develop that argument in the court claims? As to whether it applies, or whether... Whether having raised 4.16, it implicated both. Yes, Your Honor. In the, our final brief to the court in our motion, process motion for judgment on the administrative record, and then also we raised it in the motion for reconsideration. So, Your Honor, if, just not sure I'm answering your question right. Well, I mean, I can see that you mentioned it in the motion for reconsideration, but all of your arguments below quoted 4.16a, talked about 4.16a. I mean, why isn't the government correct that until the motion for reconsideration, 4.16b doesn't even come up, so why are we looking at it? The PDBR itself never addressed 4.16 at all until the third decision, and when it did, it only addressed Part A. So we didn't have an opportunity or a need to raise it other than maybe obliquely we raised it as to, you know, errors that the PDBR should address. But they never addressed it directly until the third time they looked at it, and then at that third time, they only addressed A. So when we first came back on, after the decision on remand to the Court of Federal Claims, we raised the issue. We said, well, yes, the PDBR did finally address 4.16 as to unemployability as to A, but just did not address at all B. And that essentially was our, there wasn't anything else to argue about because there was no development of the record or analysis by the PDBR. But it was your burden to raise issues and to support them. Correct, Your Honor. If, so from the complaint going forward, and actually in the first application of the PDBR back in 2012, we raised the issue generally 4.16. Until 2017, the PDBR never addressed the issue at all until it came out with analysis as to 4.16A. And so that was our first opportunity or need to, or ability to, because as you say, this is the third time around. And you're saying the first time 4.16B came up was a motion for reconsideration the third time. That's a bit late. Actually, Your Honor, in our motion for, in our judgment on the administrative record, we raised the issue of unemployability as well. It wasn't until the footnote six of the court's decision memo where it disposed of the argument and said we waived it. And I think that's an important issue, Your Honors, is that the question is, of course, whether we waived it. If we did not waive it, then there's further analysis and development that should happen. If we did waive it, then we've got no argument. We waived it. But Mr. Hadmaker argues that it's very clear since the first application from the PDBR, he raised the issue of unemployability. He raised it actually under two sections. He raised it under the DOD instruction as well as the VA regulation, 38 CFR. Moving through to the complaint, we raised it again. It's never addressed, never addressed. We discussed it. And then the PDBR finally does address it. So that's the first real time that it came up, Your Honor. If you raise it in the complaint, why don't you argue it prior to their raising it? Because of the administrative nature of the underlying proceeding at the PDBR, there isn't an opportunity until the administrative record comes together. So there's nothing relevant to talk about there until the third time around when they are. And again, coming back to the importance of the records coming in, the relevance, and why they're needed for judicial review, the problem with the questioning of Mr. Hadmaker's credibility also goes to both the vertigo and the OCD conditions. So the PDBR in its decision talked about both as we're unable to make determinations as to credibility in a vacuum, but given the lack of contemporaneous records and the achievement that you would expect from providers. You had those records all along, right? Yes, Your Honor. So why wouldn't you think that, especially after the first remand, why wouldn't you have submitted those? At that point, the PDBR had not addressed any lack of prescription records or other treatment records as an issue in the case. Records that anyone reasonably could think would support one's credibility or that would be relevant to the conditions that you're arguing, so why not submit them? I mean, at some point, isn't there the right to say too little, too late? In the context of a normal trial at district court level, yes, absolutely. However, in an administrative remand case where the government provides the administrative record, the government assembles the records of all the files in the case that were considered by the agency on the original decision and then supplemented as going forward perhaps with other remands. But is it your position that any time a rationale is cited by the PDBR or any administrative agency that you then have the right to go back and seek to refute that rationale with additional records even if they've been in your possession all along? Or to put it another way, don't you have the burden of presenting evidence which is in your possession which you believe supports your case? And clearly, you believe that those additional medications support your case. Not in the context of an administrative remand to the military correction boards, Your Honor, because there's two factors there. One is, do we have possession in the first case? So if we don't have possession, then the whole question goes away. So we have to have that as a predicate. But the second one is- An applicant says, I suffer from this whatever condition is. And by the way, I not only got treatment within the military record system, but I had to go out and get treatment elsewhere. It seems to me that cries out for saying, and here's the records of that. If that were relevant to a normal determination, your normal step-by-step determination of the issues are whether or not a condition is unfitting in the first place. And then if it's unfitting, then you apply the VA standards. Prescription treatment for either condition is not a predicate for unfitness, certainly, you know, in the abstract. And then on top of that, it doesn't impact the rating determination, except for there is some lower percent ratings under the- But I'm surely supportive of the applicant's position, is it not? As things develop, ultimately, yes, Your Honor. But in the first instance, until the PDBR came up and said, one, the lack of these records is something that concerns us. The government should assemble the administrative record and make its decision on that. So this is the issue of the negative evidence. By going outside of the record and saying that, we make these findings based on what's not there, the PDBR should have been confined to what it actually did look at. And it could have said, well, these don't support that. But you can't say, because these aren't, these records that may or may not exist are not present. That was the burden on the government and as part of the administrative record assembly. So to answer Your Honor's question, no, the burden is on the government to assemble the administrative record. Counsel, your time has almost expired, including that which you wish to say. We'll let you have two minutes for rebuttal time. And let's hear from the government. Mr. Dillingham. Thank you, Your Honor. May it please the court. This case is not about Mr. Hatmaker's medical condition. It's not about whether he should get more pay. It's not whether he's served his country admirably. It's not whether he'll be taken care of by the Veterans Administration. It's simply whether Judge Patricia Campbell-Smith abused her discretion in failing to, A, allow Mr. Hatmaker to submit more documents, have an eighth hearing, there were four before the Court of Federal Claims, there were three before the PDBR, and whether- Did the government have all these prescription records? I'm sorry? Did the government have all these prescription records as he argues? The ones that were at issue were ones that I think were his private civilian records. So, the record opens when in 2005, so November 2012, so now we're five years after Mr. Hatmaker leaves the military. He submits an application. The application form specifically says he will be given at least two weeks to submit documents. It says if you make no specific assertion, the board will search the record it has. The military is required, the affected service, the Air Force here is required to supply the service record, not private records. So that's what I'm saying is, did the government fail to include these records in the administrative record it was required to put together? No, Your Honor. It's really not my understanding. These are not military records, these are private records that were obtained from either after Mr. Hatmaker left the service, or were through a private physician, Dr. Maligon, for example, a family physician he'd been seeing for some time. There were some records from him. And so at issue are the 12 documents that he submitted to Judge Campbell-Smith. She said that she looked at those and to discern whether they would have made any difference in light of the nature of the board's analysis they would not have. They fell under three different categories. One, Mr. Hatmaker said, well, there's some speculation in the record as to when I first began to take OCD medication. I'm sorry, take the OCD medication, citalopram. The board said in an offhanded remark, he first began taking in 2007. The documents appear to be connected with gallbladder surgery he received. He referred to that as speculation. It really didn't amount to much of anything. And Judge Smith found that in fact, when she looked at the document that was submitted that indicated he did have gallbladder surgery at that time, that really confirmed what the board had said, but it was really no part of the board's analysis. Why isn't a scarring patch relevant to vertigo? So it is. That particular document was offered for the purpose, as Mr. Hatmaker explained, to refute negative evidence by the board at 8-296, in our brief here, our appendix here, that there was a suggestion that his citalopram was not filled after February 2007. He then offered eight documents. He described this in his motion to correct the administrative record at page 326 of our record here. And that patch was one of them. It wouldn't really have amounted to anything. In other words, he offered it with respect to OCD, but that patch has nothing to do with OCD. From my now education on this, I would review this record. It clearly does have to do with vertigo. But the fact that a patch was suggested as a prescription at some point means nothing. The nature of the board's analysis was they looked very careful at the nature of vertigo, and there were two that were at issue. One was vestibular disequilibrium, basically an effect on the ear, which is described according to the medical literature as coming on very quickly, inconsistent with his reports and his medical records, and then sort of subsiding over time. A second sort of vertigo, which was described by the VA, was benign paroxysmal positional vertigo, described as lasting only minutes if you stand up quickly or you shake your head or something like that. And so that's not the sort of thing that really makes any difference, but was important not only understanding the nature of the etiology of those diseases, what was important was understanding whether these had any effect on his service, and they apparently did not. In fact, when he went to the VA in 2008, having left the service five or six months earlier, his first rating was for 10%, I think it was only 10%, oh, it was 0%, I'm sorry, 0%. And that was consistent with a disease that can, or a condition that can sort of come and go. So there was really nothing there. So the bottom line on this business is the documents he offered really didn't change the record at all. The other documents he did offer with respect to OCD were, again, the question was whether there was an error in referring to the fact that he had not taken citalopram after February of 2007, but the board record contained other evidence that he was taking other kinds of drugs. What about the relevance of 416B? As the court has been discussing with Mr. Perry, it's up to the party to raise it. So no doubt he referred to 416 generally in his brief. As Judge Smith observed, the language that he used closely, very closely, mirrors 416A in a DOD regulation that basically says the same thing. It says if there's a combination of diseases, and in this case, he actually was given relief in 2010 under 416A. The VA there noted that he had, what's required is if you have more than one rateable disease that wouldn't be rated at least 40%. In total, the rest of them amount to 70%, and on that basis, he was awarded 100% having already been at 90% in 2010. So 416A has always been in the picture. It's where he stands now in respect to his rating, at least as far as this record is concerned. It's what he mirrored both in his application to the board and his identical description of what he was doing, again, mirroring the language of 416A without naming it. And then finally, he referenced it specifically in his first motion for judgment on the administrative record. He specifically said 416A. That caused Judge Campbell-Smith, understandably, as she explained in her reconsideration motion, to focus on 416A, and she described it in quite some detail. The question there was whether 416A should control, because it has this arithmetic behind it that in order to get total disability, you have to have at least one disease with 40 and a total of 70. There's other ways to get it as well. I don't really understand your argument that even though 416A applies to the error course, that 416B does not. Is that really the position you're taking? So no bus deal is the case we've cited, saying if you don't raise it, then, as Judge Campbell-Smith said, understandably, the court and the board will focus on that, and that's what they did. When she did focus on it in her very first decision, there was no further mention of it in the second motion for judgment on administration. Well, I understand your waiver argument. Yeah. Okay, so you just answered me with another waiver argument. What I don't really understand is, and maybe you're not really making this argument, but do you really contend that 416B does not apply to the error course, even though 416A clearly does? So the argument we've made, yeah, that's been our position. The argument that we made was that 416B is different in nature. 416A definitely applies. It's a rating provision. The Air Force, the DOD has definitely adopted that, so when you're into the 30s, the 50s, the 60s, the 70s, you're gonna do it the way the VA does it, basically. 416B says it's the policy of the VA, and perhaps that wouldn't be a distinguishing factor there, but then it goes on to say, if someone is unemployable, basically, and there was no evidence of that when he was in the military. Of course, he was actually employed then. He was in the military, and the record can suggest he's been employed since then, although now apparently his troubles are such that he finds it very difficult to get employed, but that was not the case back in 2007 when he left the service. Anyway, it says the record will be sent on to the Director of Compensation Services of the VA. This is not particularly, you wouldn't expect that the DOD would, at least under the regulation then, would be sending documents on to the VA to determine whether a soldier or whether a service member is disabled to one degree or another while they wait for his release from active duty. He was scheduled to be released from active duty in May of 2007. The informal PEB had met, and they were waiting for him to decide whether to appear before. Would you say that PEB doesn't apply by its terms? It first states a policy, and then it says rating board should submit to the director for extra scheduler consideration all cases of veterans who are unemployable. That's right. Is this not such a case? It certainly was not in 2007, and in fact, even when he was rated as employable by the VA, it apparently was done under 416-A. Did I hear you say in passing that he totaled at 90 and so you treated it as 100? I'm sorry, I didn't. Did I hear you say in passing that when the calculation was done, it totaled at 90%? Eventually, it got to 90%. And then it was treated as 100 because it was over 70%. That's right, and this was in 2010 when his first appearance before the VA or his first submission to the VA was in January 2008. He was rated on April 22nd, 2008. This appears in the record at 663. He was zero for vertigo, which was the only rated condition, the only unfitting condition coming out of the Air Force. 10% for OCD, 50% for sleep apnea, and then asthma was deferred basically. The asthma later on was rated at 10, and eventually, he got up to 90, and that was sometime later. So March 3rd, 2009, so now he's out of the service more than a year, a year and a half, something of that nature. This appears at 754 of the appendix. He was 90% then, vertigo, 30%, OCD, 10%, asthma, 10%, sleep apnea, 50%. So that was really the driving force. You haven't answered the question yet. The question was, was 90 converted to 100? No, 90 was definitely, yeah, definitely. So in March of 2010, I'm not sure this is in the record. Parts of it may be in the record, and there's certainly allusions to it in the briefs and the decisions and so forth, but on March 15th, 2010, he received a rating taking him to 100%. This was in the original administrative record at 257, entitled, described as entitlement to individual employability, and there they described that he was being rated as 100% based on his then employability. Really no question that what the military had to do was consider what they were being presented with then while he was on active duty. Things, as things developed, unfortunately, later, they tended to degrade, and that's when the VA takes over. If there's no further questions, Your Honor, we respectfully request the decision of the Court of Federal Claims be affirmed. Thank you, Mr. Billingham. Mr. Perry has two minutes if you need it. Thank you, Your Honor. Just a few points from Mr. Billingham's argument. The, one we just wanna clarify, that his OCD rating that was eventually raised to 10% was also backdated with an effective date, so as happens in a lot of these cases with veterans, they make an initial determination, and then after that, they go through the DPL's process, so I just wanna clarify that there was some more severity than suggested. The issue with 416B's application or applicability to the Air Force, two points. One, and not to inject this, it's certainly not in the record but just my practice is before these military boards, the majority is before the physical evaluation boards at the agency level, and I've direct knowledge that the agency has in the past, the Air Force specifically, has, it's very rare, but has directed, instead of sending it to the VA, has sent it to their chief headquarters, DPAM, D-P-A-M-M, is the overarching physical disability evaluation agency, and the director has made decisions in the past under the unemployability regulation. The other issue that I would like to point out to the court is that currently, the VA does provide ratings for military cases, disability cases, under the Integrated Disability Evaluation System, IDES, that's accomplished where, again, under the 2008 National Defense Authorization Act, Congress directed that the military secretaries and the VA secretary confer and see if they can work out a system where the VA provides ratings so that there isn't a disparity between military ratings and VA ratings applying the same schedule. What IDES has been accomplished under is a memorandum of understanding, so it's not binding, but it certainly can be achieved that the VA can apply ratings under whatever theory to the Air Force, and I think my time has expired. I ask that the decision of the court be reversed and remanded, thank you. Thank you very much, the case is submitted.